## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **DEMAR BENNETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-CV-858-CLM** |
| | ) | |
| **PIPE WORK SOLUTIONS,** | ) | |
| **LLC, and RAYMOND STOVER** | ) | |
| | ) | |
| **Defendants.** | | |

## <u>MEMORANDUM OPINION</u>

Demar Bennett is a homosexual, African-American man. Bennett sues his former employer, Pipe Work Solutions, LLC, and his former boss, Raymond Stover, under 42 U.S.C. § 1981 and Title VII, alleging claims for hostile work environment and sexual harassment. Bennett also alleges state-law claims for assault, battery, and outrage. Defendants have moved for summary judgment on each claim. (Doc. 51).

For the reasons explained within, the Court **grants in part** and **denies in part** Defendants' motion. This case will move forward on Bennett's §1981 hostile work environment claim (Count I) and his state-law battery claim (Count III). All other claims are summarily dismissed.

# FACTUAL BACKGROUND

Pipe Work Solutions, LLC ("Pipe Work") is a water and sewer pipe company based in Anniston, Alabama. Raymond Stover founded Pipe Work in 2012. Stover is Pipe Work's president and 50% owner.[1]

Stover hired Demar Bennett in December 2015. Bennett worked in various roles at Pipe Work, including administrative assistant, camera truck operator, project manager, and Chief Operating Officer. About 14 months into the job, Bennett resigned. In his resignation letter, Bennett cited Stover's use of profanity, insults, degrading comments, and violent tantrums as deciding factors.

Stover did, in fact, use derogatory and vulgar language when speaking to Bennett, including racial and homophobic slurs. While crass language appears to have been common around the Pipe Work workplace,[2] it appears that no one crossed the racial and homophobic line like Stover.

Specifically, Stover had a penchant for using the word "nigger." One time, after Bennett told Stover that he needed sleep because he had worked all day and night, Stover told Bennett that he was "acting like a fucking nigger." Another time, when reviewing Bennett's work, Stover said, "here you go, doing that fucking nigger

---

[1] Wei Zhoa owns the remaining 50% interest in Pipe Work. Zhoa is a silent partner; he lives in China and is not involved in Pipe Work's day-to-day operations.

[2] See Doc. 41, p. 6, ¶ 10.

work" and "looks like lazy nigger work." On yet another occasion, during a work phone call between Stover, Bennett, and Stover's daughter, Brandi, Stover called Bennett "a fucking nigger." During the same phone call, Stover instructed his daughter, who was in the same room as Bennett, to take him off speaker phone and then called Bennett "that fucking nigger, that mother fucker, that mother fucking nigger" so loudly that Bennett could hear each slur.

Stover's use of "nigger" seems to have had few, if any, contextual limits. For example, one time when Bennett told Stover that he was willing to accept additional work responsibilities, Stover called Bennett the "head nigger in charge" in front of several other Pipe Work employees. Bennett also alleges that Stover told him, "you're a proper nigger because you were raised semi-right."

Nor was Stover's use of the word limited to Bennett; he used it when talking about other African-American employees too. For instance, Stover once told Bennett, "you better come get this fucking nigger," referring to Deunte Cooley, another African-American employee.[3] On another occasion, Stover told Bennett that Kevin Milton, another African-American employee, "did nigger work sometimes and . . . [would] give the nigger okay head," and "[would] just do the nigger bobble."

---

[3] At some point, Cooley dated Stover's daughter, Brandi. During that time, Stover told Bennett several times that he "didn't mind [Brandi] dating a black guy, but he didn't want her dating a nigger and [Cooley] was a nigger."

Not only did Stover insult Bennett based on his race, he also insulted Bennett based on his sexual orientation. Early in Bennett's employment, a rubber sex toy in the shape of a male genitalia fell out of a trash trap at the Pipe Work shop and Stover said to Bennett, "there goes your toy." Twice, Stover referred to Bennett "swinging both ways." Stover also told Bennett that his sexuality was "unnatural." In addition, while on a job, Stover called a sewer plug a sexual object to Bennett's liking, and allegedly tapped Bennett's rear end with the plug and said, "this is something you are used to."

Insults may not be the only thing that Stover hurled at Bennett. Bennett alleges that Stover threw a down-hole roller and a TV camera at him on separate occasions. The parties agree that Stover threw the equipment in Bennett's direction, and that the down-hole roller hit Bennett, but Stover disputes that he intended to hit Bennett with the equipment. When Stover threw the down-hole roller, it hit Bennett's right foot, causing it to swell. The swelling prevented Bennett from wearing boots or coming to work for two days.

Bennett complained many times to Stover about his use of the word "nigger" and his comments about Bennett's sexual orientation. Bennett also complained about Stover's race-based comments to Wei Zhao, the 50% co-owner of Pipe Work.

Bennett ultimately resigned in April 2017. He then filed a complaint with the Office of Federal Contract Compliance Programs ("OFCCP"). The OFCCP

investigated Bennett's complaint and issued him a Right-to-Sue letter. Bennett timely filed this lawsuit.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes show the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Id*. at 324. All factual inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986).

**ANALYSIS**

In his Amended Complaint (doc. 21), Bennett asserts claims under 42 U.S.C. § 1981 for a racially hostile work environment (Count I), under Title VII for sexual harassment (Count V), and under Alabama state law for assault, battery, and the tort of outrage (Counts II, III, IV). The Court addresses the claims in that order.

## I.   Bennett's Hostile Work Environment Claim Survives Summary Judgment; His Constructive Discharge Claim Does Not.

Bennett labels Count 1 "Racial Discrimination pursuant to 42 U.S.C. § 1981." (Doc. 21, pp. 7). The majority of Count 1 alleges a hostile work environment. (Doc. 21, ¶ 26-32). But the last sentence of the last paragraph states: "The plaintiff was forced to resign his employment in order to escape the physical and emotional abuse, and has therefore lost wages and other benefits." In their briefs, the parties treat this sentence as a possibly distinct claim for constructive discharge, presumably under Title VII. So, in an abundance of caution, the Court addresses both of Count 1's possible theories of relief: Hostile Work Environment and Constructive Discharge.

### A. Bennett's Hostile Work Environment claim survives summary dismissal.

To prove a hostile work environment claim, an employee must show that his "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

21 (1993) (citation and internal quotation marks omitted); *see also Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (noting that Title VII and § 1981 hostile work environment claims have the same elements and are subject to the same analytical framework). To establish a hostile work environment claim based on race, a plaintiff must prove five elements:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

*Adams v. Austal, USA, LLC*, 754 F.3d 1240, 1248–49 (11th Cir. 2014). Defendants concede (for summary judgment only) that Bennett can establish the first, second, third, and fifth elements listed above. (Doc. 52, pp. 16, 17). So Bennett's claim hinges on whether he can create a jury question that the harassment at Pipe Work was "severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment." *Adams*, 754 F.3d at 1248–49.

To satisfy the "severe or pervasive harassment" element, Bennett must show that his work environment was both subjectively and objectively hostile. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). Bennett must first establish that he "subjectively perceive[d] the environment to be abusive." *Harris*,

510 U.S. at 21. Bennett must then show that his work environment was one "that a reasonable person would find hostile or abusive." *Id*.

Bennett easily clears the first hurdle (*i.e.* subjective perception). He repeatedly complained to Stover, privately and in front of other Pipe Work employees, about Stover's racist remarks. (Doc. 53, p. 15, ¶ 10). Bennett also testified that he experienced racial hostility at Pipe Work and referenced Stover's harassment in his resignation letter. *Id*. at p. 10, ¶ 31. Thus, a reasonable jury could conclude that Bennett subjectively perceived his work environment as hostile and abusive.

In evaluating whether Bennett's work environment was objectively hostile—that is, whether another person would find the environment hostile—the Court must consider four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Although these factors help guide the inquiry, "the objective element is not subject to mathematical precision." *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir.2009). Instead, the Court must view the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). With this in mind, the Court evaluates each factor in turn:

1. <u>Frequency of conduct</u>: Bennett provides sufficient evidence of frequent harassment. To start, Bennett testified that Stover used racial slurs, including the word "nigger," weekly or daily, and that Stover's use of the word "nigger" was so constant that it would be "impossible [for Bennett] to list every occasion." (Doc. 41, pp. 16, 18, 21). The Eleventh Circuit has considered such testimony when determining the frequency of racial harassment. *See, e.g.*, *Smelter v. S. Home Care Servs.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (considering plaintiff's testimony that she heard racist comments "every day" as evidence of frequent racial harassment).

Bennett also provides many specific examples of Stover using racial slurs. Stover does not dispute (at least for summary judgment) that he called Bennett and other African American Pipe Work employees "niggers"; accused Bennett and other African American employees of doing "nigger work"; accused Bennett of "acting like a fucking nigger"; called Bennett a "mother fucking nigger" and "the head nigger in charge"; and accused another African American employee of doing a "nigger bobble."

Stover instead argues that his use of racial slurs was too sporadic to create a hostile work environment. Stover claims that, by his count,[4] Bennett identifies only

---

[4] The Court makes no finding that Stover's count is accurate. Rather, the Court has identified additional instances, set forth in Bennett's interrogatory and deposition testimony, when Stover allegedly used racial slurs. For example, Stover's count omits Bennett's testimony about an occasion when, upon learning that a piece of equipment had been damaged, Stover allegedly told Bennett, "he was tired of this half-ass nigger work." *See* Doc. 41, p. 17.

four times that he called Bennett a "nigger," only three times that he used the slur about other Pipe Work employees in front Bennett, and only two times that other Pipe Work employees told Bennett that he used the slur. (Doc. 52, p. 16).

Stover relies heavily on the unpublished case *Fortson v. Carlson*, in which the Eleventh Circuit held that the plaintiff failed to create a fact question about the frequency of his harassment when he testified to only nine incidents involving racially derogatory language (specifically, "black ass" or "black ass fool") over his two-and-a-half-year employment period. 618 F. App'x 601, 607 (11th Cir. 2015). In Stover's view, if the nine incidents in *Fortson* were not enough, then neither are the nine incidents Stover acknowledges here.

Even if *Fortson* sets the bar, Bennett clears it, as he testified to at least the same number of incidents as *Fortson* (nine), in less than **half** the time (14 months). *Fortson* is also distinguishable in that Fortson's coworkers, not his supervisor (as in this case), harassed him. *See also Adams,* 754 F.3d at 1251-57 (distinguishing harassment by supervisors and coworkers).

But this case is more like the published case *Jones v. UPS Ground Freight*, in which the Eleventh Circuit held that the plaintiff created a fact question on the pervasiveness of his harassment when he testified to seven racist incidents over a one-year period. 683 F.3d 1283, 1304 (11th Cir. 2012).

Caselaw aside, Bennett offers at least nine specific examples of Stover saying "nigger," and he testified that Stover used the slur daily over a 14-month period. This is ample evidence of frequent harassment.

2. <u>Severity of conduct</u>: Bennett offers evidence of "severe" misconduct at Pipe Work, so this factor weighs heavily in his favor. The Eleventh Circuit has said that "use of the slur 'nigger' is severe," especially when, as here, the slur is (a) used by a supervisor and (b) directed at the plaintiff, not just overheard by the plaintiff. *Adams*, 754 F.3d at 1255. Indeed, the Eleventh Circuit has held that even one-time use of the word can constitute severe harassment. *Smelter*, 904 F.3d at 1286 ("Southern Home argues that Smallwood's 'one-time use' of ['nigger'] was insufficient to establish severity as a matter of law. We strongly disagree."); *see also Adams*, 754 F.3d at 1255 (holding that a supervisor's "isolated act"—carving the slur "porch monkey" in front of the plaintiff—was severe); *cf. Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) (holding that "the use of ['nigger'] on one occasion by one co-worker away from the workplace" was not severe, particularly because it was not directed at the plaintiff).

Here, not only did Stover repeatedly say "nigger" around Bennett, he directed the slur at Bennett and other African American Pipe Work employees to demean

them and to disparage their work.[5] Stover's use of uniquely offensive and racist language qualifies as severe harassment.

3. <u>Physical Threat or Humiliation</u>: The Defendants argue that Bennett has presented no evidence of physically threatening harassment, arguing that Bennett "points to no threats of physical violence" that accompanied Stover's racist remarks. But this factor is established by conduct that is "physically threatening *or* humiliating." *Mendoza*, 195 F.3d at 1246 (emphasis added).

Bennett testifies that Stover used the slur "nigger" around him daily. A reasonable person could find that Stover intended for the slur to humiliate Bennett. *See Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 848 (11th Cir. 2017) ("Here, two of Cooler's supervisors used the severe slur 'nigger' in an attempt to get a reaction out of him. A reasonable person could perceive their intent was to humiliate Cooler"). For example, a reasonable person could find it humiliating for Bennett to hear his supervisor call his work "lazy nigger work," and to call him a "fucking nigger" and "the head nigger in charge."

4. <u>Interference with Job Performance</u>: Bennett offers little evidence that Stover's harassment interfered with his day-to-day job performance, other than

---

[5] The Defendants urge the Court to either ignore or afford diminished weight to Stover's remarks that "were either made about other Pipe Work employees . . . or were relayed second-hand to Bennett and did not relate to Bennett." (Doc. 51, p. 19). But in evaluating a plaintiff's work environment in the totality of the circumstances, "we . . . include other employees' experiences that the plaintiff was aware of at the time." *Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 847 (11th Cir. 2017).

forcing Bennett to spend time meeting with Stover and others to address Stover's harassment. Accordingly, this factor does not weight in Bennett's favor.

* * *

In summary, the only question here is whether a reasonable juror could find that Stover's harassment was severe or pervasive enough to alter the terms and conditions of Bennett's employment and create a discriminatorily abusive working environment. Bennett easily meets three of the four factors set forth by the Eleventh Circuit when judging the "severe or pervasive" element. *Mendoza*, 195 F.3d at 1246.

And as the Supreme Court has made clear, "no single factor is required" to establish the objective component. *Harris*, 510 U.S. at 23. Instead, the court is to judge the totality of the circumstances. *Reeves*, 594 F.3d at 808. Viewed in that lens, the Court finds that the cumulative evidence presented by Bennett is enough to allow a reasonable person to find that Stover's harassment was severe or pervasive enough to create an abusive work environment. Thus, Bennett's hostile work environment claim survives summary judgment.

## B. Bennett's Constructive Discharge Claim Does Not Survive Summary Judgment.

Bennett ends Count 1 with the following sentence: "The Plaintiff was forced to resign his employment in order to escape the physical and emotional abuse, and has therefore lost wages and other benefits." (Doc. 21, p. 8, ¶ 33). If Bennett intends

this sentence to raise a distinct claim of constructive discharge (as the parties discuss in their briefs), it is summarily dismissed for two reasons.

1. <u>Procedure</u>: Placing one sentence about constructive discharge within a distinct §1981 claim of hostile work environment violates Rules 8(a)(2) and 10(b). *See Bickerstaff Clay Prods. Co. v. Harris Cnty.*, 89 F.3d 1481, 1485 n. 4 (11th Cir. 1996) ("The complaint is a typical shotgun pleading, in that some of the counts present more than one discrete claim for relief."); *Cesnik v. Edgewood Baptist Church*, 88 F.3d 902, 905 (11th Cir. 1996) (characterizing as a shotgun pleading a complaint that "was framed in complete disregard of the principle that separate, discrete causes of action should be plead in separate counts"); *Novak v. Cobb Cnty. Kennestone Hosp. Auth.*, 74 F.3d 1173, 1175 & n. 5 (11th Cir. 1996) (referring to a complaint that pleaded multiple causes of action in a single count as "a quintessential 'shotgun pleading'"). Simply put, if Bennett intended to plead a distinct claim of constructive discharge, then he needed to plead that claim in its own count, with enough facts and law to meet the Rules' pleading requirements.

2. <u>Merits</u>: Even if Bennett met the pleading requirements, his constructive discharge claim would fail as a matter of law. Constructive discharge entails a heavy burden. A plaintiff must show that "working conditions were so intolerable that a reasonable person in h[is] position would have been compelled to resign." *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *see also Virgo*

*v. Riviera Beach Assocs.*, 30 F.3d 1350, 1363 (11th Cir. 1994). This is a "more onerous task than establishing a hostile work environment claim." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). Indeed, to prove constructive discharge, Bennett "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Id*.

In addition, constructive discharge typically requires an adverse change in the plaintiff's work conditions. *See, e.g.*, *Poole v. Country Club of Columbus*, 129 F.3d 551, 553 (11th Cir. 1997) (reversing summary judgment for the employer where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"); *see also Morgan v. Ford*, 6 F.3d 750, 753 (11th Cir. 1993) (finding constructive discharge when the plaintiff prison guard's supervisor reassigned her to "the more distasteful duties around the [prison] compound," including assigning her "to the guard tower, although she did not have proper weapons certification, to the unit for AIDS patients, and to the housing ward for violent inmates.").

Bennett does not allege that his job responsibilities were reduced or that his work conditions were altered. On the contrary, at the time of his resignation, Bennett continued to perform his typical work tasks. He experienced no pay cut or demotion, nor was he isolated from his coworkers. Thus, even though Bennett offers sufficient evidence of harassment to support his hostile work environment claim, he has failed

to establish that his working conditions were so intolerable that a reasonable person would have felt compelled to resign.

Furthermore, in his resignation letter, Bennett expressed that he was quitting not only because of Stover's harassment, but also because of "differences of opinion regarding the processes, work assignments, and goals for how [the parties'] original work agreement was supposed to play out." (Doc. 41, p. 9). His resignation letter reads: "It is clear to me that you and I will not be able to resolve our differences. Therefore, I feel that resigning is the best option for me." *Id*.

A resignation is considered voluntary if the plaintiff had a choice, even if the alternatives to resignation may be unpleasant. *See Hargray v. City of Hallandale*, 57 F.3d 1560, 1568–69 (11th Cir. 1995). Bennett's resignation letter shows that he voluntarily chose to resign. A reasonable person in Bennett's shoes may have also chosen to resign but would not have been *compelled* to do so. As a result, Bennett's constructive discharge claim fails as a matter of law.

## II.    Bennett's Sexual Harassment Claim Fails As A Matter Of Law.

Bennett titles Count V "Sexual Harassment in Violation of Title VII." In it, Bennett alleges that he was "exposed to vulgar and degrading sexual comments and statements, and was subjected to discrimination *based on his sexual orientation*." (Doc. 21, p. 12, ¶ 51) (emphasis added). Under Eleventh Circuit precedent, however, Title VII sexual orientation claims are invalid. *Evans v. Georgia Reg'l Hosp.*, 850

F.3d 1248 (11th Cir.), *cert. denied*, 138 S. Ct. 557 (2017). *See also Bostock v. Clayton Cty. Bd. of Commissioners*, 723 F. App'x 964 (11th Cir. 2018), *cert. granted*, 139 S. Ct. 1599 (U.S. April 22, 2019) (No. 17-1618) (reaffirming *Evans*).

In *Evans*, the Eleventh Circuit reaffirmed that sexual orientation is not a protected classification under Title VII. *Id.* at 1255-57; *see also Fredette v. BVP Mgmt. Assocs.*, 112 F.3d 1503, 1510 (11th Cir. 1997); *see also Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979). As a result, Bennett's discrimination claim "based on his sexual orientation" as a male homosexual fails as a matter of law.

Despite unambiguously claiming in his Amended Complaint that he was discriminated against and harassed based on his sexual orientation, Bennett now attempts to recast his claim as a same-sex sexual harassment claim. (Doc. 53, p. 28). Bennett's attempt fails for two reasons.

First, Bennett cannot assert a new claim in response to summary judgment. *See Flintlock Const. Services, LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1227–28 (11th Cir. 2013) ("This court's precedent foreclosed [plaintiff's] attempt to amend its complaint at the summary judgment stage without seeking leave of court pursuant to Rule 15(a)(2)."); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a).").

Second, Bennett offers no evidence to support a same-sex harassment claim. To establish same-sex harassment, a plaintiff must prove: (1) the harasser is homosexual; (2) the harasser has a gender-based hostility towards a particular sex; or (3) the harasser treated members of one sex differently than the other sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 (1998) (requiring a plaintiff to "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex.") (internal quotations omitted). Bennett offers no evidence that (1) Stover is homosexual, (2) Stover as a gender-based hostility towards men, or (3) Stover treated men differently then women in the workplace due to their sex. So even if Bennett could claim same-sex harassment, his claim would fail as a matter of law.

### III. Bennett's Battery Claim Survives Summary Judgment, But His Assault Claim Does Not.

Bennett raises a state-law claim of assault in Count II (doc. 21, pp. 8) and a state-law claim of battery in Count III (doc. 21, pp. 9). While they are distinct claims, assault and battery are often analyzed together because they involve overlapping elements and facts. The Court does so here.

1. The law: Under Alabama law, assault is "an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an

imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Hester v. Brown*, 512 F. Supp. 2d 1228, 1235 (N.D. Ala. May 25, 2007) (internal citations omitted).

When an assault is "successful," it becomes a battery. *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995). The elements of battery are: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *Wood v. Cowart Enters.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001).

2. <u>The incidents</u>: Bennett's assault and battery claims stem from two separate incidents when Stover allegedly threw work equipment at him. (Doc. 21, pp. 9–10, ¶¶ 35, 40). First, Bennett alleges that shortly after he began working for Pipe Work, Stover threw a piece of equipment called a "down-hole roller" at him, striking him in the foot. Because Bennett was hit, this is the battery claim. Second, Bennett alleges that on the day before he resigned, Stover threw a camera at him but did not strike him with it. This is the assault claim.

Bennett brings both claims not only against Stover, but also against Pipe Work on a theory of vicarious liability, arguing that Stover was acting within the line and scope of his employment with Pipe Work when the incidents occurred.

The Defendants argue that both claims fail as a matter of law because Bennett has failed to provide sufficient evidence that Stover intended to hit or touch him. The Court agrees as to Bennett's assault claim but disagrees as to his battery claim.

3. Battery: With respect to his battery claim, Bennett testified that Stover was upset at him when the incident occurred. (Doc. 51, p. 186). Bennett also testified that he and Stover were communicating as the incident occurred and that Stover knew where Bennett was standing when he threw the equipment. (Doc. 51, p. 188). Bennett testified that Stover told him "you're in the damn way" when he threw the equipment, and that he did not apologize afterwards:

```
14        Q        Did he say anything to you, either
15     before or after the throw, to indicate that he
16     intended to hit you?
17        A        Either you're in the damn way or get
18     out of the damn way, something like that.  There was
19     no excuse me or sorry or I didn't know, so I assumed
20     it was intentional, since there was no apology.
```

(Doc. 51, p. 190). Based on this evidence, a reasonable jury could determine that Stover intended to hit Bennett with the down-hole roller. *See Surrency*, 489 So. 2d at 1104 ("[W]hen there is conflicting evidence . . . the issue of whether there was, in fact, an assault and battery at all is a question for the jury.")

4. <u>Assault</u>: The same cannot be said for Bennett's assault claim. In Bennett's brief testimony about the incident, he does not allege that Stover was angry with him at the time, that Stover knew where he was standing, or that Stover made any comments showing an intent to strike him. (Doc. 51, p. 189). Thus, Bennett has not created a jury question on Stover's required intent. Bennett's bare allegations, without more, are too speculative and conclusory to survive summary judgment. *Ave. CLO Fund, Ltd. v. Bank of Am.*, N.A., 723 F.3d 1287, 1294 (11th Cir. 2013) (speculative factual inferences are not reasonable for summary judgment purposes); *Celotex Corp.*, 477 U.S. at 324 (plaintiff must go "beyond the pleadings" to show a genuine issue for trial).

Finally, although he asserted no such claim in his Amended Complaint, Bennett tries to assert another battery claim in his summary judgment response based on an incident when Stover allegedly "tapped Bennett on his rear end in a sexual nature." (Doc. 53, pp. 24.) But as discussed in Part II, Bennett cannot assert new claims in his response to summary judgment. *Flintlock*, 710 F.3d at 1227–28. Thus, Bennett's newly alleged claim fails as a matter of law.

## IV. Bennett's Outrage Claim Fails As A Matter Of Law.

Finally, in Count IV, Bennett alleges that the "racial discrimination and physical violence" described in his other claims amounts to the state-law tort of outrage. (Doc. 21, pp. 10).

Under Alabama law, to establish the tort of outrage, a plaintiff must prove that the defendant's conduct: "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Harrelson v. R.J.*, 882 So. 2d 317, 322 (Ala. 2003) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993)). Alabama has further defined the tort of outrage as follows:

> [O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

*Harrelson*, 882 So. 2d at 331-32 (citing *Am. Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)) (internal citations omitted); *see also Thompson v. City of Birmingham*, 5 F. Supp. 3d 1304, 1329 (N.D. Ala. 2014) (holding that the tort of outrage applies "only in flagrantly egregious circumstances") (internal quotations omitted); *see also Surrency*, 489 So.2d at 1105 (recognizing the plaintiff's burden is a "heavy" one).

The tort of outrage is "extremely limited," and the Alabama Supreme Court "has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in

the family-burial context, *Whitt v. Hulsey*, 519 So.2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So.2d 322 (Ala. 1989)." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).

Indeed, both the Alabama Supreme Court and the Eleventh Circuit have been extremely reluctant to extend the tort of outrage to other categories of conduct. *See, e.g.*, *Stancombe v. New Process Steel LP*, 652 F. App'x 729, 732 (11th Cir. 2016) (holding that the act of grabbing another's head and making pelvic thrusts in his face is boorish, vulgar, and unacceptable, but was not outrageous enough to satisfy the requisite element of outrage); *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986) (holding that no extreme or outrageous conduct occurred when the defendant-supervisor stated that he wanted to have an affair with the plaintiff, attempted to kiss her, made suggestive remarks, touched her and put his arm around her, and then terminated her employment because she had refused his advances).

Here, however, the Court need not determine whether the conduct at issue is outrageous enough to justify expanding the tort, because Bennett has offered no evidence on an essential element of the tort—*i.e.* that he suffered extreme emotional distress. In his brief, Bennett overlooks this element and instead focuses exclusively on nature of the conduct at issue. Because Bennett offers no evidence he suffered

"emotional distress so severe that no reasonable person could be expected to endure it," *Harrelson*, 882 So. 2d at 322, his claim necessarily fails.

## Conclusion

For these reasons, the Court hereby **GRANTS** the Defendants' motion for summary judgment on Bennett's Title VII sexual harassment claim (Count V) and his state-law assault and outrage claims (Counts II & IV). The Court **DENIES** the Defendants' motion on Bennett's §1981 hostile work environment claim (Count I) and state-law battery claim (Count III). The Court also finds that Bennett's Amended Complaint does not state a claim for constructive discharge, and if it did, that claim would be summarily dismissed. The Court will issue a separate order carrying out these findings.

DONE and ORDERED this **26th** day of March, 2020.


**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE